Gregory Dilbeck was indicted by the June 1990 Lawrence County grand jury for five counts of sodomy in the first degree and four counts of sexual abuse in the first degree. Bobbie Dilbeck was indicted at the same time for two counts of sodomy in the first degree and four counts of sexual abuse. The jury returned a verdict finding both of the appellants "guilty as charged" in the indictment.
Gregory Dilbeck was sentenced to life imprisonment on counts I, II, VI, VII, IX, XIV, and XV of the indictment charging him with sodomy in the first degree; these seven life sentences are to run concurrently. He was sentenced to 10 years on counts III, IV, VIII, and XII, each charging sexual abuse in the first degree. The four 10-year sentences are to run concurrently *Page 170 
with each other and consecutively to the 7 life sentences.
Bobbie Dilbeck was sentenced to life imprisonment on counts I and XI of the indictment, each charging sodomy in the first degree; the two life sentences are to run concurrently. She was sentenced to 10 years on counts IV, V, X, and XIII, each charging sexual abuse in the first degree. Each of the four 10-year sentences are to run concurrently with each other and consecutively to the 2 life sentences.
This case arose between August 1988 and February 1990 in Lawrence County, Alabama at a child day-care center operated by Bobbie Dilbeck. Gregory Dilbeck, Bobbie Dilbeck's son, was living at the house which served as a day-care center and as a residence for the appellants. On February 4, 1990, the parents of the children were notified of the allegations made by a parent of 2 children in the Dilbeck's day-care center and were instructed to make alternate arrangements for day care pending the investigation. Mrs. Dilbeck was notified that her license had been suspended effective February 7, 1990.
J.C. testified to "bad touches" which had been made by both appellants when he was at the day-care center. E.C., a six-year-old, who was in day care at the Dilbeck house, also testified to "bad touches" by Gregory Dilbeck. K.B., a five-year-old, also testified to "bad touches" given to him by Gregory Dilbeck. K.B. further stated that Bobbie Dilbeck had taken his clothes off one time and given him a whipping. K.B. also testified that Gregory Dilbeck had filmed some of the incidents.
A parent of two sisters testified to increased sexual awareness, nightmares, and bed wetting by one child. Two physicians, Dr. Couch and Dr. Kristi Mulchaley at Children's Hospital in Birmingham, Alabama, testified that upon examination of the children, they found nothing out of the ordinary.
Outside the presence of the jury, S.R., the mother of one of the alleged victims, testified as to the unavailability of her daughter, B.R., in accordance with § 15-25-37, Code of Alabama 1975. B.R. had told S.R., her mother, that Gregory had put lotion on his penis in B.R.'s presence.
Dr. Laura Beverly, a resident in pediatrics at Children's Hospital in Birmingham, Alabama, testified that she had examined B.R. and noted no trauma to the genital or anal regions or any other evidence that indicated sexual activity. Dr. Kristi Mulchahey, a children's obstetrician/gynecologist at Children's Hospital, testified that she examined J.C. and that other than the fact that the child had masturbated, his examination was within normal limits.
Paul Cain, an investigator for the Lawrence County sheriff's department, participated in interviews with the alleged victims in the case. He testified he had been called by the Department of Human Resources in February 1990. He obtained a warrant on February 2, 1990, for Gregory Dilbeck based upon allegations of sexual abuse and contact. In the search of the Dilbeck house/day-care center, the following items were discovered: 13 videotapes, of which 12 were not offensive; a playboy centerfold; and pink lotion.
The mother of J.C. and A.C. testified that J.C. had told her "Miss Bobbie" and Gregory had touched him and threatened him. She went to an attorney, who referred her to the district attorney, who in turn referred her to the Department of Human Resources.
D.B., mother of K.B., next testified that her child was in the day-care center for three months. She testified that K.B. had told her that Bobbie and Gregory Dilbeck took children upstairs during naptime and that he had been filmed naked with Bobbie Dilbeck naked.
Gregory Dilbeck testified that he had never abused the children and that the children liked him. He testified further that he had never seen his mother sexually or physically abuse the children.
Will Dilbeck, Bobbie's husband and Gregory's father, testified that Bobbie was very protective of the children in the day-care center and was careful to protect them.
Bobbie Dilbeck testified that she shared a warm relationship with the children and *Page 171 
that the children had never observed any sexual acts or any sexual material while in the day-care center.
 I
Ala. Code 1975, § 15-25-31, provides:
 "An out-of-court statement made by a child under twelve years of age at the time of the proceeding concerning an act that is a material element of any crime involving child sexual abuse, as defined in section 15-25-38 below, which statement is not otherwise admissible in evidence, is admissible in evidence in criminal proceedings, if the requirements of section 15-25-32 are met."
Section 15-25-32 provides:
 " § 15-25-32. Same — Requirements of admissibility.
 "An out-of-court statement may be admitted as provided in section 15-25-31, if:
 "(1) The child testifies at the proceeding, or testifies by means of video tape deposition as provided by section 15-25-2, or testifies by means of closed circuit television as is provided in section 15-25-3, and at the time of such testimony is subject to cross-examination about the out-of-court statements; or
 "(2) a. The child is found by the court to be unavailable to testify on any of these grounds:
"1. The child's death;
 "2. The court finds that there are reasonable grounds to believe that the defendant or someone acting on behalf of the defendant has intentionally removed the child from the jurisdiction of the court;
"3. The child's total failure of memory;
"4. The child's physical or mental disability;
 "5. The child's incompetency, including the child's inability to communicate about the offense because of fear or a similar reason; or
 "6. Substantial likelihood that the child would suffer severe emotional trauma from testifying at the proceeding or by means of closed circuit television; and
 "(b) The child's out-of-court statement is shown to the reasonable satisfaction of the court to possess particularized guarantees of trustworthiness."
 A
The appellants first contend that the court erred to reversal in not requiring that their counsel be provided with out-of-court statements of two of the alleged victims until after the hearing to declare the two children unavailable.
Ala. Code 1975, § 15-25-35, provides:
 "The proponent of the statement must inform the adverse party of the opponent's intention to offer the statement and the content of the statement sufficiently in advance of the proceeding to provide the defendant with a fair opportunity to prepare a response to the statement before the proceeding at which it is offered."
This record establishes that on August 16, 1990, and August 17, 1990, the State filed a motion to declare certain witnesses to be unavailable for testimony. A hearing was held on August 23, 1990, pursuant to § 15-25-30 et seq., Code of Alabama 1975.
Before the proceeding, the appellants objected on the ground that they had not been informed of the contents of the statements which were the basis of the hearing, in compliance with § 15-25-35, and that consequently they had not had a fair opportunity to respond to the statements before the proceeding began. The trial court denied the motion on the basis that the first question to consider was whether the child would be available to testify and, then, if the court determined that the child would be unavailable, it would get to the question of the statement itself, which would be a separate procedure.
After evidence given by experts concerning the availability of the witnesses, the court declared that T.C. and B.R. would be unavailable to testify. The State then filed with the court the substance of the out-of-court statements of B.R. and T.C. These *Page 172 
statements were made available to the appellants on August 23, 1990, the day of the hearing.
This court, in Fortner v. State, 582 So.2d 581 (Ala.Cr.App. 1990), cert. denied, 582 So.2d 587 (Ala. 1991), addressed this same question. In that case, the defendant argued that the record did not show that the State had given the notice required by § 15-25-35, Code of Alabama 1975. This court held that the defendant in that case failed to preserve the issue for review, but went on to say: ". . . because a lengthy hearing was held on the admissibility of the out-of-court statements before they were offered, because it appears that defense counsel was sufficiently prepared to oppose the admission of the statements, and because counsel did, in fact, file a written motion to suppress the statements before they were introduced into evidence, we find the defendant had notice adequate to allow him 'a fair opportunity to prepare a response to the statement[s].' " Fortner, 582 So.2d at 586.
In the instant case, the availability hearing was held four days before the trial began. The hearing was lengthy and the appellants were able to cross-examine the witnesses.
We find that the appellants had adequate notice to allow them "a fair opportunity to prepare a response to the statement[s]."
 B
The appellants contend that while some inquiry was made as to § 15-25-32(2)a, absolutely none was made as is required by §15-25-32(2)(b), which provides: "The child's out-of-court statement is shown to the reasonable satisfaction of the court to possess particularized guarantees of trustworthiness."
During the availability hearing, the court ruled that issues as to guarantees of trust-worthiness and other corroboration would be taken up after further testimony had been given. During trial, outside the presence of the jury, three witnesses testified as to the out-of-court statements and the circumstances surrounding the statements. The trial judge ruled as follows:
 ". . . And I will so hold that I find that as to the next step involved that there is an element of trustworthiness of the statements, considering first of all the child's personal knowledge of the event, the fact that she was there and that she testified apparently from some personal knowledge. Looking at the credibility of the witnesses that testified, Mrs. R., Mr. R., Mr. C., I find their testimony regarding the statements to be credible for purposes of this examination by the Court. I have also considered any potential motive the child may have to falsify or distort the event, the timing of the child's statements, whether . . . the age of this child, who is now three and a half, and at the time these statements were made would have, or could have, in describing these statements, fabricated this. It appears that the statements as to the spontaneity, appears to be spontaneous, and also looking at the other evidence that has been presented as to the opportunity for these alleged acts to have been committed, the Court has considered all of these, the factors involved, and rules that the out-of-court statements, the due process considerations as under section thirty-seven of this Act, processed trustworthiness. So that we can go to the next step and that step is whether or not under section thirty-four there has been other corroboration and as I have listened to the testimony I find that there is other testimony from witnesses that have testified that would in fact corroborate these statements. And I will therefore overrule the motion to exclude and allow theses statements to be preserved. Now, that also will take into consideration in doing so that the Defendants may of course as to cross-examining the witnesses that will take the stand and testify in front of the Jury, that the opportunity of cross-examining these people and of course their testimony itself would go to the jury as to the credibility and weight. And further, as part of the Act, the Court will instruct and inform the jury that in fact these statements made, were made out of court and that there is *Page 173 
no otherwise cross-examination that is afforded these defendants, and that instruction will be given to the jury as the Act requires under Section Thirty-six. And so that will go to the jury for its consideration along with the other evidence that may be presented." (R. 635-637.)
Section 15-25-37, Code of Alabama 1975, contains the factors in considering the trustworthiness of statements such as these. This section reads as follows:
 " § 15-25-37. Factors in considering trustworthiness of statement.
 In determining whether a statement possesses particularized guarantees of trustworthiness under section 15-25-32(2)b, the court shall consider any one, but is not limited to, the following factors:
 "(1) The child's personal knowledge of the event;
"(2) The age and maturity of the child;
 "(3) Certainty that the statement was made, including the credibility of the person testifying about the statement;
 "(4) Any apparent motive the child may have to falsify or distort the event, including bias, corruption, or coercion;
"(5) The timing of the child's statement;
 "(6) Whether more than one person heard the statement;
 "(7) Whether the child was suffering from pain or distress when making the statement;
 "(8) The nature and duration of any alleged abuse;
 "(9) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;
 "(10) Whether the statement has a 'ring of verity,' has an internal consistency or coherence, and uses terminology appropriate to the child's age;
 "(11) Whether the statement is spontaneous or directly responsive to questions;
 "(12) Whether the statement is suggestive due to improperly leading questions;
 "(13) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement. (Acts 1989, No. 89-876, p. 1754, § 7.)"
It is clear from the trial court's order that the factors set out in § 15-25-37, Code of Alabama 1975, were considered in determining the trustworthiness of the statements. From a review of the record it is clear that the trial court was satisfied that the out-of-court statements possessed sufficient guarantees of trustworthiness as required by § 15-25-32, Code of Alabama 1975.
Therefore, the contention by the appellants that no inquiry was made as required by § 15-25-32(2)(b) is without merit. The court was in full compliance with § 15-25-32(2)(b) and §15-25-37, Code of Alabama 1975.
 C
The appellants, citing Idaho v. Wright, 497 U.S. 805,110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), assert that the trial court erred in finding the out-of-court statements of B.R. and T.C. admissible.
 "In Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), which involved a prosecution for the sexual abuse of children, the United States Supreme Court was called upon 'to decide whether the admission at trial of certain hearsay statements made by a child declarant to an examining pediatrician violates a defendant's rights under the Confrontation Clause of the Sixth Amendment.' 497 U.S. at ___, 110 S.Ct. at 3143. In that case the child-witness did not testify. The Court held that the admission of the child's out-of-court statements violated the defendant's Confrontation Clause rights only because the prosecution did not prove the reliability of the statements. However, the Court noted that 'we have in any event held that the Confrontation Clause does not erect a per se rule barring the admission *Page 174 
of prior statements of a declarant who is unable to communicate to the jury at the time of trial.' ___ U.S. ___, 110 S.Ct. at 3151. The Court held that incriminating statements admissible under an exception to the hearsay rule are not admissible under the Confrontation Clause unless the prosecution 1) produces, or demonstrates the unavailability of, the declarant whose statement it wishes to use and 2) unless the statement bears an adequate 'indicia of reliability.' " Fortner, 582 So.2d at 584.
The "adequate indicia of reliability" requirement can "be met in either of two circumstances: where the hearsay statement 'falls within a firmly rooted hearsay exception,' or 'where it is supported by a showing of particularized guarantees of trustworthiness.' " Wright, ___ U.S. at ___, 110 S.Ct. at 3147.
Here, the appellants were not denied their constitutional rights of confrontation and cross-examination because the prosecution demonstrated the unavailability of the witnesses at a hearing conducted four days prior to trial and the prosecution proved the reliability and trustworthiness of the statements. See Jones v. Dugger, 888 F.2d 1340 (11th Cir. 1989); Fortner; Wright, ___ U.S. at ___, 110 S.Ct. at 3147. We reject the appellants' argument that they were not allowed their full rights under the Confrontation Clause found in Art. 1, § 6, of the Alabama Constitution of 1901.
 II A
The appellants contend that a verdict was rendered in violation of their constitutional rights. First, the appellants allege that the indictment was vague, ambiguous, and broad to the extent that they could not prepare for their defense. Specifically, they contend that neither indictment specified the time that the alleged offenses occurred. Each count of the indictment stated that the alleged offenses occurred "before the finding of this indictment and subsequent to January 1, 1980."
As this Court stated in Sasser v. State, 494 So.2d 857, 859
(Ala.Cr.App. 1986):
 " 'It is not necessary to state in the indictment the date or time at which an offense was committed. Bush v. State, 431 So.2d 555
(Ala.Cr.App. 1982), aff'd, 431 So.2d 563 (Ala. 1983), cert. denied, Bush v. Alabama, [464] U.S. [865], 104 S.Ct. 200, 78 L.Ed.2d 175 (1983).
 " 'The Code of Alabama, 1975, § 15-8-30, states as follows:
 " ' "It is not necessary to state the precise time at which an offense was committed in an indictment; but it may be alleged to have been committed on any day before the finding of the indictment or generally before the finding of the indictment unless time is a material ingredient of the offense." '
 "Thornton v. State, 480 So.2d 34 (Ala.Crim.App. 1985). See also Coburn v. State, 424 So.2d 665
(Ala.Crim.App. 1982); Tucker v. State, 429 So.2d 1165 (Ala.Crim.App. 1982); Rule 15.2(d), Alabama Temporary Rules of Criminal Procedure."
In the instant case, like in Sasser, time was not a material ingredient.
 B
The appellants also contend that there was not sufficient evidence to sustain a verdict and judgment of guilt. The standard for determining sufficiency of evidence was set out by this Court in Linzy v. State, 455 So.2d 260 (Ala.Cr.App. 1984):
 "The standard of review in determining sufficiency of evidence is whether evidence existed at the time appellant's motion for acquittal was made, from which the jury could by fair inference find the accused guilty. Stewart v. State, 350 So.2d 764 (Ala.Crim.App. 1977); Hayes v. State, 395 So.2d 127
(Ala.Crim.App.), writ denied, Ex parte Hayes, 395 So.2d 150
(Ala. 1981). Stated differently, the test is 'whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis, but *Page 175 
whether a jury might reasonably so conclude.' Cumbo v. State, 368 So.2d 871 (Ala.Crim.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979); United States v. Black, 497 F.2d 1039 (5th Cir. 1974); United States v. McGlamory, 441 F.2d 130
(5th Cir. 1971). In deciding this issue, we are required to view the evidence presented in the light most favorable to the state.
 Hayes, supra; Bass v. State, 55 Ala. App. 88, 313 So.2d 208 (1975).
 " 'Whether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant's guilt is a question for the jury and not the court.' Cumbo, supra; Cannon v. State, 17 Ala. App. 82, 81 So. 860 (1919). Our function is not to be factfinders, however tempting that may sometimes be. We must not substitute ourselves for jurors, not play their role in the criminal process. Jury verdicts should not be disturbed unless they are not based upon evidence sufficient to meet the test set out above."
Linzy, at 262.
After a review of the record, we find that sufficient evidence was presented from which the jury might have reasonably excluded every reasonable hypothesis other than that of the appellants' guilt.
 III
The appellants contend that the trial court erred in failing to grant a mistrial when a victim's father and uncle forcibly tried to approach the appellants during the course of the trial. After the disturbance, the trial judge described the outburst for the record as follows: "While the jury was in the box and the trial was proceeding, that the two men each disrupted the proceeding by getting up and approaching the defendants as they sat at the table."
Following the disturbance, the court asked the jury to go with the bailiff to the jury room. The court found both men in direct contempt of court and sentenced them to three days in the county jail.
After the two men were taken to jail, the court addressed the individuals remaining in the courtroom and lectured them as to the creation of disturbances and what the court would do in the case of disturbances. Both defendants asked for a mistrial, stating that the confrontation could not be removed from the minds and memories of the jurors, and that it would be virtually impossible for the jurors to be fair and impartial.
Then the court brought the jury in to inquire of the members whether or not they would be able to continue. The trial judge stated that he would question the jury and then make a decision as to whether to grant the motion for a mistrial.
The trial judge stated as follows:
 "THE COURT: Ladies and gentlemen of the Jury, with the episode which took place in your presence and caused a recess and I had you go to the jury room, I guess there are always things that happen in the trial of any case, and unfortunately we have had that happen here. It is necessary and important that I ask each of you several questions that will touch and concern fairness that must play a part in any trial, and will be here. And that is, specifically, your ability in spite of what has happened, to remain and to sit as a Juror and to perform your duty, to receive the evidence, listen carefully to the evidence, and to, at the appropriate time, deliberate. So my question to each of you is, would you be able to put aside in your mind the episode which just took place, I don't recall that necessarily anything was spoken, but just the action of the individuals from out in the Courtroom, would you be able to put that aside and to fairly and impartially for all of the parties involved, the State and each Defendant, to hear the evidence as it continues to come from the witness stand, sit as a body Jury, and to finally deliberate the case and return a verdict, whatever that may be, which is your own individual decision and is fair and impartial, considering only the evidence that comes from the courtroom as I have previously described for you in applying the law in the case? And I *Page 176 
would ask each of you that question. C.B., would you be able to do that? This is an opportunity if you think otherwise to let me know. My first concern always is the safety of anyone that is in the courtroom, certainly a jury, certainly the parties. And I am insuring you of that. And so that goes with the question I am asking of each of you. Mrs. B., you say that you could?" (R. 657-658.)
The question was asked of each juror and each juror answered the question in the affirmative.
Then appellants' counsel approached the bench to request that the court present to the jurors the question that if the State fails to meet the burden of proof on one, or any, or all the counts contained in the indictment, would they have any hesitation or anxiety to render a not guilty verdict because of the disturbance that had occurred in their presence.
The court then asked the following question:
 "THE COURT: Ladies and gentlemen, let me ask you an additional question following up on the response that you have given, because it is important for the Court to make a determination whether or not with the response you have given, you would be fully and completely free to render a verdict in fulfilling your duty, which would be free from outside influence which has been exhibited in the Courtroom. Now, I ask each of you again, in performing your duty, and considering the evidence, deliberating as a Jury, and in taking the law that the Court would give you in its charge, we're not to that point yet. And in the charge I would discuss such things as the specifics of the offenses that are alleged that have been mentioned to have previously and read from the indictment, and the plea of not guilty that the Defendants make, all of that will be discussed with you in the Court's charge. And I also discuss with you burden of proof, and there has been some mention made of that already. My question is this, taking into consideration the burden of proof and those other matters that apply in the law that you're given, the burden on the State to prove these Defendants guilty beyond a reasonable doubt of the material elements of the offenses charged, you will be given the specifics of that later, and assuming also the plea of not guilty that has been made, would you ladies and gentlemen be able to hear the evidence that will come later, in addition to what's already been presented, listen to the law, deliberate, and individually and collectively return a verdict that is in fact your verdict and based only on the evidence and the law and done so without fear, favor, bias, sympathy, anything like that which may come in or may be in your mind by reason of this disruptive conduct which has been exhibited in Court? Does anyone not understand the essence of my question to you?
"(NO RESPONSE FROM THE JURY)
 "THE COURT: In other words, would you be unable by reason of the disruptive conduct which has been exhibited in Court, would you be unable to render a fair and impartial verdict by reason of some type of fear or bias or favor consistent with that conduct shown in Court; do you understand my question? Anyone not understand my question?
"(NO RESPONSE FROM THE JURY)
 "THE COURT: In other words, I want to make certain that the verdict that you reach is based solely on the evidence and the law and not done out of fear that a particular verdict might result in disfavor or displeasure from the community, from the State, from the Defendants, from anyone else, but it must be a verdict based on the evidence and the law and the product of your fair and impartial consideration and deliberation among the twelve that will decide the case. Any one that does not understand that?
"(NO RESPONSE FROM THE JURY)
 "THE COURT: That goes in any case not just this one. The important question is, you can put that out of your mind, any effect it may have, whether it biases the State or biases the Defendant. But your verdict must be absent any bias, any prejudice, any fear, any preference and based solely on the testimony, *Page 177 
the evidence presented, and the law that I will give you. Does everyone understand that question put to you?
"(NO RESPONSE FROM THE JURY)." (R. 662-665.)
Upon receiving no response from the jury, the court then polled each individual juror and each answered affirmatively that they would be able to render a fair and impartial verdict.
In Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450,98 L.Ed. 654 (1954), the Supreme Court held that in order to determine the effect of third-party contact with a jury, the trial court should investigate the circumstances of the contact, its effect on the jurors, and any prejudice to the defendant. Remmer, 347 U.S. at 230, 74 S.Ct. at 451. The Sixth Amendment states in part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ." The trial judge has the responsibility of protecting the defendant's right to a fair trial, and his findings regarding juror partiality and any subsequent corrective action taken by him are entitled to great deference on appeal. See United States v. Madrid,842 F.2d 1090, 1092 (9th Cir.), cert. denied, 488 U.S. 912,109 S.Ct. 269, 102 L.Ed.2d 256, 257 (1988); Nebraska v. Press Ass'n v.Stuart, 427 U.S. 539, 555, 96 S.Ct. 2791, 2801, 49 L.Ed.2d 683
(1976).
In the present case we conclude that the trial court proceeded properly and did not abuse its discretion in denying the appellants' motion for a mistrial. The trial judge's questioning of the jurors was unhurried and thorough. The appellants' counsel were permitted to request a question, which was then asked of the jurors. All the jurors said they could continue as impartial jurors. The appellants failed to prove actual bias, and the trial court properly denied the motion for a mistrial.
As this court stated in Reeves v. State, 518 So.2d 168
(Ala.Cr.App. 1987):
 "While the defendant is entitled to a trial free of any extraneous influences that might be to his prejudice, Hammond v. State, 26 Ala. App. 391, 160 So. 900 (1935), a criminal trial should be public. Jackson v. Mobley, 157 Ala. 408, 47 So. 590 (1908). If the conduct of a spectator interferes with the administration of justice, he may be removed. Williams v. State, 57 Ala. App. 158, 326 So.2d 686, cert. denied, 295 Ala. 428, 326 So.2d 692 (1975). Much is left to the discretion of the trial judge in this regard. McGuire v. State, 239 Ala. 315, 318, 194 So. 815 (1940). . . .
 ". . . It is not generally held to be an abuse of the trial judge's discretion to deny a new trial when the victim's immediate family have sat within the bar of the court, within view of the jury, and when they wept, sobbed aloud, or even fainted. Howard v. State, 273 Ala. 544, 142 So.2d 685
(1961). . . ."
Reeves, at 173.
In support of his argument, the appellants cite Hammond v.State, 26 Ala. App. 391, 160 So. 900 (1935), in which this Court reversed and remanded the judgment of the trial court, holding that it was error not to grant a mistrial. That case involved a prosecution for manslaughter in which the deceased's mother staged a highly improper demonstration wherein she arose from her seat and loudly cried and prayed and shrieked and yelled and fell to the floor, and during her removal from the courtroom, she continued to loudly cry, shriek, yell, and pray. However, the factor which distinguishes the Hammond case from the case at bar is that the trial judge in Hammond did not take any corrective action.
There is no doubt that the conduct in the instant case involving a victim's father and uncle was highly improper. However, we consider the actions of the trial judge in questioning and polling the jurors to be correct and also sufficient to have cured the alleged error.
 IV
After the defense rested, the State moved to recall the appellant, Gregory Dilbeck. The appellant objected. The Court asked for an explanation. The following *Page 178 
discussion was had outside the presence of the jury.
 "MR. LITTRELL [prosecutor]: Judge, I had asked before — I had asked the Court before, to be allowed one other question on cross-examination of Greg Dilbeck.
"THE COURT: All right.
 "MR. ROBY [defense counsel]: We're going to object to that, your Honor, we don't think that he has a right to recall any witness.
 "THE COURT: All right, would you gentlemen approach the bench, please, on that regard.
 "(DISCUSSION AT THE BENCH OUTSIDE THE HEARING OF THE JURY)
 "MR. ROBY: I'll tell you, I'll just be honest with you, I don't know whether you got the right to do it or not.
 "MR. LITTRELL: Well, it's discretionary with the Court.
"THE COURT: What is the reason for your request?
 "MR. LITTRELL: You want to know what I'm going to ask him?
 "THE COURT: Yes, I mean what you know now that you could not have asked him earlier.
 "MR. LITTRELL: I'm going to ask him if he had a conversation at the skating rink in Moulton, approximately five years ago in the presence of Shane Sizemore wherein he made a statement, Greg Dilbeck, that he was having sex with his mother.
 "MR. ROBY: Your Honor, we're going to object to that. Five years, that's so far removed in point of time.
 "MR. LITTRELL: I think it's very relevant in this case.
 "MR. ROBY: No, not five years ago. You're talking about a statement of a fifteen year old boy.
 "MR. LITTRELL: And I did not know about that until today.
 "MR. ROBY: That's so sensational and inflammatory. It has no probative value.
 "MR. OSBORN: I think it's been talked about quite a bit.
 "THE COURT: I think those questions have been asked. I was sitting here thinking —
 "MR. LITTRELL: There's testimony in the case that Greg Dilbeck and Miss Bobbie were . . .
 "THE COURT: All right. I'll let you ask the question, I think there's been testimony on direct and cross-examination —
 "MR. ROBY: But only as it relates to these charges, Judge. Could I put an objection on the record?
"THE COURT: Go ahead.
 "MR. ROBY: I'm going to try to do it outside the hearing of the jury. Tim?
"THE COURT: Just go over by the Court Reporter.
 "MR. ROBY: The State has asked to recall the Defendant, Greg Dilbeck, for the purpose of asking one further question. It has made known to the Court that the question will be whether or not some five years ago that he made a statement at the Moulton Skating Rink that he was having sex with his mother. Both Defendants object on the grounds that it is so far removed and remote as it — that it would have no probative value on this hearing. Further, we would object on the grounds that the State has no right to recall a Defendant in the case to testify after he's once been released from the stand. We would also object on the grounds that the Defendant has been asked, in both direct and cross-examination, if he has had sex with his mother, and it has been denied and therefore the question has been asked and answered. That's my objection." (R. 1513-1515.)
The court made reference that the question having been asked, thus opening the door without objection and inviting error. However, from a review of the record, it appears that the only question asked of the appellant during cross-examination was if he slept with his mother. The question was asked in the context of where one sleeps at night. Gregory Dilbeck denied that he slept with his mother. The testimony in the record is as follows:
"Q Do you sleep in your bedroom?
"A Very seldom. *Page 179 
"Q Do you sleep on a waterbed in this room?
 "A I have maybe three times the whole time we have lived in that house.
 "Q Did you tell Mr. Cain during that interview, I'm referring again to the fifth, 'I can't even sleep in that room where y'all found those panties. I usually sleep with momma. She sleeps on the water bed because she has to have a soft bed. Daddy sleeps in the other room because he has to have a hard bed.'
 "A I told him that momma had to have a soft bed and daddy had to have a hard bed and couldn't — she's got one particular back problem and he has got another one, but I never told him that I slept with my mother.
"Q You didn't say that?
"A No, sir.
"Q Do you?
"A Do I what?
"Q — or did you?
"A Did I sleep with my mother?
"Q Yes, sir.
 "A I imagine when I was probably four or five —
"Q Have you within the last two years?
"A No, sir." (R. 1129-1130.)
The State was allowed to recall the appellant, Gregory Dilbeck, and to ask him if he had made a statement in the presence of Shane Sizemore, that he, Gregory Dilbeck, was having sex with his mother Bobbie Dilbeck. The appellant denied that he made this statement.
Shane Sizemore was then called on rebuttal and was asked specifically, if approximately five years earlier he had heard Gregory Dilbeck make the statement that he was having sex with his mother. The witness answered that he had and stated that he went home and told his mother what the appellant had said. Judy Sizemore, the mother of Shane Sizemore, was then called and testified that she recalled that her son recounted to her a conversation that he had with Gregory Dilbeck, the appellant.
The State argues that the question was evidence of unnatural sexual passion of the appellant and therefore is an exception to the general rule concerning prior bad acts and was not presented for the purpose of simply showing the bad character of the appellant.
The appellants objected, asserting that the question as to whether five years earlier Gregory Dilbeck had made a statement that he had sex with his mother was remote in time, could have been asked at trial on cross-examination, had no probative value, and was highly inflammatory. The court overruled the objection and allowed Gregory Dilbeck to be re-examined on the issue.
However, such testimony in its final analysis shows nothing more than the defendant's character is bad or that he is morally deficient.
In Brasher v. State, 249 Ala. 96, 30 So.2d 31 (1947), the Alabama Supreme Court held:
 "It follows, therefore, that for the purpose of identification, the prosecution should not be permitted to give in evidence other crimes of the defendant, committed on or with other persons, unless they are so connected by circumstances with the particular crime in issue as that the proof of one fact with its circumstances has some bearing upon the issue on trial other than to show the defendant's had character or moral delinquency. [Citation omitted.]
 "In the case of State v. Start, 65 Or. 178, 132 P. 512, 46 L.R.A., N.S., 266, the defendant was convicted of sodomy. The State was permitted to call several witnesses, who testified that they themselves at other times had participated with the defendant in similar acts. In reversing the judgment of conviction, the Supreme Court of Oregon said:
 " 'To admit testimony that the defendant at other times and places, and under wholly disconnected circumstances, had committed like offenses with parties not named in the indictment, all for the purpose of making it appear that the accused has the bent *Page 180 
of mind adapted to such actions, would cloud the issue and confuse the jury.' "
Brasher, 30 So.2d at 35.
More recently, regarding prior bad acts the Supreme Court, inAnonymous v. State, 507 So.2d 972, 973-74 (Ala. 1987), stated:
 "The general evidentiary principle, long adhered to in Alabama, which must be applied in this case may be stated as follows: In a prosecution for one offense, evidence of collateral crimes or acts is generally inadmissible to prove the guilt of the accused. See Ex parte Cofer, 440 So.2d 1121 (Ala. 1983); Ex parte Killough, 438 So.2d 333 (Ala. 1983); Brasher v. State, 249 Ala. 96, 30 So.2d 31
(1947); Haley v. State, 63 Ala. 89 (1879); Ingram v. State, 39 Ala. 247 (1864). In fact, it has been stated that such evidence is prima facie inadmissible. See Cofer, supra; Brasher, supra; Allen v. State, 380 So.2d 313 (Ala.Crim.App. 1979), cert. denied, 380 So.2d 341 (Ala. 1980).
"As was explained in Cofer:
 " ' "This is a general exclusionary rule which prevents the introduction of [collateral] criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question. This rule is generally applicable whether the other crime was committed before or after the one for which the defendant is presently being tried.
 " ' "This exclusionary rule is simply an application of the character rule which forbids the state to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of [collateral] crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of [collateral] crimes has almost an irreversible impact upon the minds of the jurors." ' "
 "Cofer, 440 So.2d at 1123 (quoting C. Gamble, McElroy's Alabama Evidence § 69.01(1) (3d ed. 1977) (hereinafter cited as 'McElroy's')."
 "The rationale for this general exclusionary rule was well stated by one commentator:
 " 'This exclusionary rule has long been the law in Alabama and every other American jurisdiction and is "[a] concomitant of the presumption of innocence," which requires that "a defendant . . . be tried for what he did, not for who is he."
 " 'Evidence that tends to show guilt of another offense is not excluded because it is irrelevant. Indeed, because "a man of bad character is more likely to commit a crime than one not [of bad character]," evidence of collateral crimes or acts is frequently highly relevant. Nonetheless, such evidence is excluded because of its potentially prejudicial impact. Evidence of collateral crimes or acts may "direct the jury's attention away from the offenses charged to a crime not charged," it may be so heinous in nature as to "incite the jury to irrational decision by its force on human emotion," or it may lead the jury to conclude that because the defendant " ' "committed some other similar crime, he must also have committed the crime for which he is on trial." ' "
 "(Footnotes omitted.) Schroeder, Evidentiary Use in Criminal Cases of Collateral Crimes and Acts: A Comparison of the Federal Rules and Alabama Law, 35 Ala.L.Rev. 241 (1984).
 "This rationale notwithstanding, there exist certain exceptions to this general exclusionary rule. Although evidence of collateral crimes and acts may not be admitted to prove the accused's bad character, it has been held admissible to prove such things as the accused's criminal intent, his motive, or his identity, or to prove that the now charged crime and another crime were committed pursuant to a single plan, design, scheme, or system. See generally, McElroy's § 69.01, and those cases cited therein. Of course, the evidence offered must be relevant to some issue that is material to the case. See Cofer, supra (evidence offered was inadmissible because it was offered to *Page 181 
prove intent and there existed 'no real and open issue' concerning the accused's intent); Killough, supra (evidence offered under the exceptions to this general exclusionary rule must be both relevant and material).
 "Application of this rule and its exceptions to the facts of the present case makes it clear that the Court of Criminal Appeals correctly determined that the evidence of the prosecutrix's pregnancy and her abortions and the sister's pregnancy and resulting child was inadmissible. There is simply no imaginable reason for the admission of this testimony other than to prove the defendant's bad character. This is, of course, not an acceptable purpose. See Brasher v. State, 249 Ala. 96, 30 So.2d 31 (1947)."
We are of the opinion that to put in evidence the alleged improper relations of Gregory Dilbeck and Bobbie Dilbeck is reversible error and not competent evidence to show that they had committed the offenses for which he was on trial, or show that the appellants had a tendency or propensity to commit such crimes. Evidence of what occurred five years ago with another person would certainly not be competent or legal evidence. The prejudicial effect of such evidence vastly outweighed its probative value. It amounts to an attempt to prove guilt in the basis of a prior bad act or acts.
We conclude that the appellants did not therefore receive a fair and impartial trial. This cause is due to be, and it is hereby, reversed and remanded to the circuit court for a new trial.
REVERSED AND REMANDED.
All the Judges concur.